UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   :
HENRIETTA PINCKNEY,                :
                                   :    05 Civ. 5652 (BSJ)(THK)
          Plaintiff,               :
                                   :    **REPORT AND**
     -against-                     :    **RECOMMENDATION**
                                   :
JO ANNE B. BARNHART,               :
Commissioner of Social Security,   :
                                   :
          Defendant.               :
                                   :
----------------------------------X
**From: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**
**To:   HON. BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.**

Plaintiff, Henrietta Pinckney ("Plaintiff"), commenced this action pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's determination that she was not eligible for Supplemental Security Income ("SSI") benefits based on disability. Defendant, the Commissioner of Social Security ("the Commissioner"), has moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and Plaintiff has cross-moved for judgment on the pleadings. The motions were referred to this Court for a Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons that follow, I recommend that Defendant's motion be denied and Plaintiff's motion be granted in part by remanding to the Commissioner for further proceedings in accordance with this Report.

BACKGROUND

## I.   Procedural Background

Plaintiff filed an application for SSI disability benefits on May 3, 2002. (R. 28-30.)[1]  She alleged an inability to work due to ankle, knee and back pain resulting from a disability that began on November 23, 2001. (R. 33.)   Her application was denied on September 4, 2002, (R. 19-22), and Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") (R. 24).  With Plaintiff's counsel in attendance, a hearing was held on December 1, 2003, before ALJ Hazel Strauss. (R. 189-223.)  By decision dated February 19, 2004, the ALJ found that Plaintiff was not disabled under the Social Security Act. (R. 8-17.)   After receiving additional comments and medical evidence from Plaintiff's counsel, the Appeals Council denied Plaintiff's request for review, making the ALJ's opinion the final decision of the Commissioner. (R. 3-6); see 42 U.S.C. § 405(h); Pollard v. Halter, 377 F.3d 183, 191 (2d Cir. 2004).  This action followed.

## II.  Factual Background

Plaintiff was born on August 17, 1945. (R. 28.)  She graduated from high school in 1964 (R. 39, 197.)  From August 1978 to February 1999, Plaintiff worked as an admitting clerk at Mt. Sinai Hospital. (R. 34, 52.)  She then worked as a telephone pension

---

[1] Citations to the administrative record are in the form "(R. __.)."

representative, from January to September 2000, and as a home
health aide, from January through November 2001. (R. 52, 199.)  On
November 23, 2001, while at her job as a home health aide,
Plaintiff fell from the wheelchair lift of a bus while attempting
to transport a patient.  She was initially seen in the emergency
room at St. Luke's Hospital, where she was treated and released.
She was subsequently treated at Beth Israel Hospital on November
28, 2001, by Dr. Andrew Sands, an orthopedic surgeon. (R. 118.)  X-
rays revealed a right proximal fibula fracture and a possible
medial meniscal[2] tear, which were accompanied by right knee pain
and right syndesmosis[3] disruption. (Id.)  On December 4, 2001, Dr.
Sands performed open reduction internal fixation surgery on
Plaintiff's right ankle. (R. 119.)  In a follow-up examination on
January 18, 2002, Dr. Sands found Plaintiff's bone position in the
ankle to be "good," he transitioned her from a walker to a cane,
and he noted that she could perform "sedentary desk work [such] as
phone or computer work; she obviously cannot be up walking around."
(Id.)  On March 11, 2002, screws were removed from Plaintiff's
ankle, (R. 55, 76), and she began physical therapy in April (R. 54-
67).  She attended physical therapy several times a week, and was

_____

[2] The medial meniscus is an intra-articular cartilaginous
structure that provides shock absorption and limited joint
stabilization. See The Merck Manual ("Merck") 2570 (18th ed. 2006).

[3] "A type of fibrous articulation in which the fibrous tissue
between the bones forms a membrane or ligament." Attorney's
Illustrated Medical Dictionary ("Att. Med. Dict.") S91 (1997).

3

discharged from physical therapy on June 26, 2002. (R. 67.)

Around this time, Plaintiff began to complain of lower back pain. As a result, on June 20, 2002, Dr. Sands referred Plaintiff to Dr. Alexander Lee, a specialist in physical medicine and rehabilitation. (R. 112-113.)  In his initial examination, Dr. Lee found that Plaintiff was well-built, well-nourished and in no acute distress. (R. 113.)   Lumbosacral range of motion was within functional limits, with minimal pain at the end of forward flexion and extension.  Motor strength was five out of five in the lower extremities, straight leg raising was negative in the seated and supine positions, and internal and external hip rotation were within functional limits and pain-free.  There was moderate tenderness to palpation along the bilateral sacral sulcus and lower lumbosacral paraspinal muscles. (Id.)  X-rays showed moderate disc space narrowing at L4-L5, and facet joint hypertrophy[4] at L5-S1. (R. 95, 116.)  Dr. Lee diagnosed mechanical lower back pain with no signs of active radiculopathy,[5] and recommended home exercise and physical therapy. (R. 113.)

In a follow-up examination with Dr. Lee on July 22, 2002, Plaintiff reported "moderate" improvement with continued toothache-type pain in the lower back area. (R. 111.)  The pain did not

---

[4] Hypertrophy is "the enlargement of an organ or part due to the increase in size of the cells composing it." Att. Med. Dict., at H43.

[5] "[D]isease of the nerve roots." The Sloane-Dorland Annotated Medical-Legal Dictionary ("Sloane-Dorland") 601 (1987).

4

radiate to Plaintiff's extremities and she indicated that she experienced the pain predominantly when she stood up from prolonged sitting. (Id.)  Dr. Lee diagnosed lower back pain and recommended that Plaintiff obtain a lumbar spine MRI. (Id.)

An MRI of the lumbosacral spine was conducted on August 12, 2002, by Dr. Norman Schoenberg of the Spine and Joint Center. (R. 114-15.)  The MRI showed L4-L5 spondylolisthesis[6]; mild to moderate spinal stenosis,[7] at the L4-L5 and L5-S1 levels, that could result in occasional sciatica[8] due to contact with either the L5 or S1 nerve root within their lateral recesses; mild to moderate bilateral L5-S1 neuroforaminal stenosis, which may be an alternate source of sciatica; and, degenerative disc disease[9] of the L4-L5 and L5-S1 levels accompanied by facet joint arthritis of both levels, which was identified as a potential cause of lower back

---

[6] "[F]orward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or the fourth lumbar over the fifth." Sloane-Dorland, at 661.

[7] "Lumbar spinal stenosis is narrowing of the lumbar spinal canal, which produces pressure on the sciatic nerve roots (or sometimes the cord) before their exit from the foramina, causing positional back pain and symptoms of nerve root compression." Merck, at 328.

[8] "Any condition that is characterized by pain along the sciatic nerve (i.e. along the buttock and down the back of the legs) usually a neuritis and generally caused by mechanical compression or irritation of the fifth lumbar spinal root." Att. Med. Dict., at S11.

[9] Degenerative disc disease, often categorized as osteoarthritis, is a common cause of sciatica. See Merck, at 294, 327.

pain. (Id.)

On August 23, 2002, Plaintiff reported similar symptoms, with back pain radiating to the left posterior knee area. (R. 110.) Clinical testing revealed motor strength of five out of five and minimal lower back pain with negative straight leg raising. (Id.) Dr. Lee reviewed the MRI conducted on August 12th, 2002 and diagnosed Grade I L4 and L5 spondylolisthesis, diffuse degenerative disc disease, and diffuse central and intervertebral foraminal spinal stenosis. (Id.) Dr. Lee recommended that Plaintiff continue physical therapy and be placed on short-term disability because she could not tolerate "significant ongoing heavy lifting" as required by her job. (Id.)

On October 8, 2002, Plaintiff returned to Dr. Lee complaining of worsening symptoms. She reported that pain was radiating to her legs (right greater than left) and "[w]orsened with walking and alleviated with sitting." (R. 109.) Plaintiff's physical examination and diagnosis remained unchanged, though Dr. Lee recommended an epidural steroid injection[10] as treatment. (Id.) Dr. Lee administered the injection on November 11, 2002, followed by a second injection on December 13, 2002. (R. 107, 103.) After each injection, Plaintiff had five out of five muscle strength and her straight leg raising was negative bilaterally. (R. 106, 102.) Plaintiff reported a 50% pain improvement after the first injection

---

[10] An injection of a local anesthetic agent into the epidural space. Orthopaedic Dictionary, at 109.

(R. 106), and a 75% improvement after the second (R. 106, 102).  On February 3, 2003, Plaintiff reported no change and a clinical examination produced the same results as the previous two examinations. (R. 101.)

On March 28, 2003, Plaintiff complained of exacerbation of her lower back pain, with pain also radiating to her right hamstring area. (R. 100.)  Plaintiff admitted to not keeping up with her home exercises. (Id.)   Motor strength was still five out of five; straight leg raising was now positive on the right; and reflexes had regressed to one out of four at the patella and zero out of four at the bilateral Achilles. (Id.)   Dr. Lee diagnosed mild exacerbation of lower back pain secondary to degenerative lumbar disc disease and L4 on L5 spondylolisthesis, and recommended a third epidural steroid injection. (Id.)

Plaintiff did not return immediately for her third epidural injection.  Instead, several months later, on August 13, 2003, Plaintiff returned to Dr. Sands with complaints of right foot deformity with accompanying weakness, pain, and swelling. (R. 119.)  X-rays showed peritalar subluxation (an incomplete or partial dislocation of the ankle), and a physical examination revealed several additional foot deformities including pes plano abducto

vulgar[11] on weight bearing and equinus contracture[12] on knee extension. (Id.)  Plaintiff, given the option of using a cushioned shoe or undergoing surgery, elected to use the cushioned shoe and "consider her options." (Id.)

On September 22, 2003, Plaintiff finally returned to see Dr. Lee. (R. 166.)  She explained that there had been a death in her family and that she had not been keeping up with her home exercises. (Id.)  Examination revealed five out of five motor strength in the lower extremities, positive straight leg raising on the left and right, as well as lumbar range of motion within functional limits with pain at the end range of extension. (Id.) Dr. Lee again recommended a third epidural injection. (Id.)  The epidural injection was administered on October 8, 2003 (R. 168), and in a follow-up examination on October 28, 2003, Plaintiff reported "approximately 30% pain relief" of her back pain (R. 169). Plaintiff had five out of five motor strength, and straight leg raising was now negative bilaterally. (Id.)  Dr. Lee recommended another epidural injection.[13] (Id.)

---

[11] A foot deformity in which the anterior part of the foot is displaced lateral to the vertical axis of the leg and the foot has a markedly reduced longitudinal arch height. Orthopaedic Dictionary 17 (1994).

[12] A foot deformity in which the heel is in plantar flexion. Orthopaedic Dictionary, at 112.

[13] The records of Dr. Lee's examinations from September 22 through October 28, 2003, were submitted as new evidence to the Appeals Council, but were not considered in the ALJ's decision.

On November 13, 2003, at the request of Dr. Lee, Plaintiff was examined by Dr. Astaire Selassie, a pain management specialist. (R. 133.)  Plaintiff complained of posterolateral thigh pain resulting from her November 2001 accident. (Id.)  Plaintiff stated that walking and lying flat made her pain worse, and that sitting made the pain better. (Id.)  She had pain on flexion at forty-five degrees and extension to twenty-five degrees, as well as five out of five muscle strength. (Id.)  Dr. Selassie requested authorization to perform a facet joint injection and noted that she was awaiting the results of previous MRIs. (Id.)

On November 25, 2003, after her second examination of Plaintiff, Dr. Selassie completed a Multiple Impairments Questionnaire regarding the functional impact of Plaintiff's facet joint arthritis and lumbar radiculopathy. (R. 125-32.)  Dr. Selassie found that Plaintiff had pain on flexion of her spine at forty-five degrees and extension to twenty-five degrees. (R. 125.) Sitting made the pain better, while walking and lying flat made it worse. (Id.)  Plaintiff also had difficulty walking, and her sleep was interrupted at night. (Id.)  Her primary symptoms were "fatigue, throbbing, [and] aching," with pain described as "constant" and resulting from "prolonged sitting, and standing." (R. 126-27.)  Plaintiff's pain and fatigue were rated as 10 out of 10, and Dr. Selassie noted that she had been able to relieve Plaintiff's pain with medication and without unacceptable side effects only "slightly." (R. 127.)  Dr. Selassie gave a prognosis

9

of "poor." (Id.)

Based on these findings, Dr. Selassie opined that, in an
eight-hour workday, Plaintiff could sit up to one hour, stand/walk
up to one hour, and could not do any lifting or carrying. (R. 127-
28.)  Plaintiff could not sit continuously in a work setting and
would "constantly" need to get up and move around. (Id.)  She had
no limitations in using her fingers/hands to grasp, turn, or twist
objects, or for fine manipulation. (R. 127-29.)  Dr. Selassie
indicated that Plaintiff could not use her arms for reaching
(including overhead), and had significant limitations in doing
repetitive reaching, handling, fingering or lifting. (Id.)  She
found that Plaintiff's condition interfered with her ability to
keep her neck in a constant position (R. 129), and that her pain,
fatigue and other symptoms were constantly severe enough to
interfere with attention and concentration (R. 130).  Dr. Selassie
concluded that during an eight-hour workday, Plaintiff would need
to take unscheduled breaks of fifteen to thirty minutes duration
approximately every fifteen minutes. (R. 130.)  She also indicated
that Plaintiff's impairment would likely produce "good days" and
"bad days," and as a result, Plaintiff would likely be absent from
work an average of more than three times per month. (R. 131.)
Finally, Dr. Selassie noted that the symptoms and limitations
discussed in the questionnaire applied since January 23, 2001 (Id.)

The same day, Dr. Selassie completed a disability certificate
classifying Plaintiff as "totally incapacitated" from November 13,

10

2003 to an "undetermined" date, based on a diagnosis of facet joint arthritis and lumbar radiculopathy. (R. 120.)

As new evidence to the Appeals Council, Plaintiff submitted a Spinal Impairment Questionnaire completed by Dr. Selassie on November 24, 2004. (R. 6, 177-83.)  Dr. Selassie reported that she had first seen Plaintiff on November 13, 2003 and had most recently examined her the same day, November 24, 2004. (R. 177.)  Dr. Selassie indicated that she treated Plaintiff three to four times per year. (Id.)  She diagnosed facet joint arthritis of the lumbar spine and gave a prognosis of "unclear." (Id.)  In support of her diagnosis, she cited clinical findings of limited lumbar range of motion, tenderness, muscle spasms, an abnormal gait, muscle atrophy, positive trigger points and positive straight leg raising at seventy-five degrees, as well as an MRI confirming facet joint arthritis. (R. 177-78.)  Dr. Selassie indicated that Plaintiff's primary symptom was pain, specifically in the lower back and lasting "all day." (R. 178-79.)  She indicated that she had not been able to completely relieve Plaintiff's pain without unacceptable side effects, and that she had substituted medications in an attempt to produce less symptomology or side effects. (R. 179, 180.)  To that point, Dr. Selassie noted that Plaintiff had been treated with facet joint injections and medication, including Bextra. (R. 180-81.)

In this report, generally consistent with her previous findings, Dr. Selassie opined that during an eight-hour workday,

Plaintiff could occasionally lift and carry up to ten pounds, sit for one hour on a sustained basis, and stand/walk for one hour on a sustained basis. (Id.)  In a work setting, Plaintiff would need to get up and move around every five minutes, for a period of ten to fifteen minutes. (R. 180.)  Dr. Selassie further indicated that Plaintiff's pain and other symptoms were "periodically" severe enough to interfere with attention and concentration; that Plaintiff's impairments would likely produce "good days" and "bad days"; and, that Plaintiff's impairments and treatment would likely keep her out of work more than three times per month on average. (R. 181-82.)  Dr. Selassie stated that it was her medical opinion that Plaintiff's symptoms and limitations referenced in the questionnaire dated back to January 23, 2001.

On the same day, Dr. Selassie completed a disability certificate, again classifying Plaintiff as "totally incapacitated" from November 13, 2003 to an "undetermined" date, based on a diagnosis of facet joint arthritis and lumbar radiculopathy. (R. 120.)

On February 1, 2005, Plaintiff submitted an MRI performed by Dr. William Louie, at the request of Dr. Selassie, to the Appeals Council. (R. 187-88.)  It showed minimal questionable L4-L5 anterolisthesis; mild L4-L5 and L5-S1 spondylosis[14] with severe

---

[14] A general term for degenerative changes due to osteoarthritis. Sloane-Dorland, at 663.

bilateral facet osteoarthritis[15]; small right foraminal L4-L5 disc protrusion; narrowed L5-S1 neural foramina with mild impingement upon the exiting L5 nerve roots bilaterally; and mild L4-L5 and mild/moderate L5-S1 spinal stenosis. (Id.)

In addition to the medical evidence documented above, there were also records produced by several consultative examiners. On June 25, 2002, after Dr. Lee's initial examination, and prior to his obtaining an MRI of Plaintiff's lumbar spine, Plaintiff was examined consultatively by Dr. Mandakini Patel, an orthopedist, at the request of the Social Security Administration ("SSA"). (R. 74-80.) Dr. Patel's evaluation noted that Plaintiff had no difficulty in sitting, could stand for 15-20 minutes, lift 5-10 pounds, and walk up to two blocks using a cane. (R. 74.)  She could also negotiate up to three flights of stairs and bend down, but with pain in both cases. (Id.)  Dr. Patel observed that Plaintiff walked with an antalgic gait[16], limping on her right side, but was able to walk on her toes and heels. (R. 75.)  She displayed no difficulty in getting up from a chair or getting into a seated position on the examining table. (Id.)

---

[15] Osteoarthritis is a "chronic arthropathy of an entire joint characterized by disruption and potential loss of joint cartilage along with other joint changes, including bone hypertrophy. Symptoms include gradually developing pain aggravated or triggered by activity, stiffness relieved [less than] thirty minutes after activity, and occasional joint swelling." Merck, at 294.

[16] A painful limp or shortening of the stance phase on the affected side by quick, soft steps to avoid weight bearing and to diminish pain. See Orthopaedic Dictionary, at 17.

Dr. Patel found that Plaintiff had normal range of motion in the cervical spine, hips, knees and toes. (R. 75.)  Plaintiff had normal range of motion in the shoulders, except flexion was limited to 110 degrees bilaterally. (Id.)  In the lower back, lumbar spine flexion was seventy degrees, and straight leg raising was positive bilaterally at fifty degrees. (Id.)  She had mild atrophy in the right leg, with four out of five muscle strength, while knee and ankle-jerks were present and equal. (R. 76.)  X-rays of the right ankle showed a healed fracture. (R. 78.)  X-rays of the lumbosacral spine showed slight anterolisthesis at L4-L5, with associated disc thinning and facet arthropathy (joint disease) at L4-L5 and L5-S1. (R. 77.)  Dr. Patel diagnosed Plaintiff with status post fracture and removal of hardware of the right ankle, and lumbosacral derangement with limitation of motion of the lumbosacral region of the spine. (R. 76.)  He concluded that Plaintiff had a "moderate impairment in standing, walking, sitting, bending and lifting secondary to the lower back pain and right ankle pain." (Id.)

On August 30, 2002, Dr. Hendrick, a non-examining agency review analyst, completed a Physical Residual Functional Capacity Assessment. (R. 81-87.)  Based on a paper-only review, Dr. Hendrick determined that Plaintiff could lift/carry ten pounds occasionally or frequently, stand/walk at least two hours in an eight-hour workday, and "must periodically alternate sitting and standing to relieve pain or discomfort." (R. 82.)  He stated that this could be accomplished by "normal breaks throughout the day and lunch time."

14

(R. 83.)   He found no postural limitations such as climbing, stooping, kneeling, crouching, or crawling. (Id.)  After reciting Dr. Patel's findings, Dr. Hendrick concluded that the evidence in the file indicated that Plaintiff had the "capacity for at least sedentary work," and that her "P[ast] R[elevant] W[ork] was sedentary." (R. 86.)  Dr. Hendrick noted that there was no treating source opinion in the file at the time of his evaluation, and that his assessment was based solely on Dr. Patel's examination. (Id.)

## III. The Administrative Hearing

On December 1, 2003, Plaintiff appeared before Administrative Law Judge Hazel C. Strauss. (R. 191.)   Plaintiff's attorney was also in attendance. (Id.)  At the hearing, Plaintiff testified to working as an admitting clerk at Mt. Sinai Hospital for twenty-two years.  She indicated that she screened patients, checked their insurance forms, and placed them in their rooms. (R. 200.)  She stated that the job required about three hours of sitting at a desk, doing computer work, and answering the telephone; the remaining five hours or so were spent walking and transporting patients from the emergency room to different floors and departments. (R. 200.)  She also stated that she had to lift and carry about five pounds. (Id.)

After leaving her position as an admitting clerk, Plaintiff worked for nine months as a telephone pension representative, which required her to communicate by telephone, process insurance information, and send and receive mail. (R. 52, 199.)   She

15

testified that this job required sitting at a computer for four to five hours a day, but varied in the hours sitting, standing and walking, often requiring her to take insurance information to the floor above for verification. (R. 199.)

Plaintiff's most recent position was as a home health aide, which she held for eleven months, through the date of her accident. (R. 198.)   She stated that she was responsible for cooking, cleaning, transporting, and bathing patients.   Sometimes, she had to lift between seventy and one hundred pounds. (R. 198-99.)

At her hearing, Plaintiff stated that she was approximately 5'3" tall and weighed 195 pounds, though she had only weighed between 160 and 165 pounds prior to her accident. (R. 196, 221.) Plaintiff testified that she was unable to work due to an injury to her right ankle, a spinal disorder, and injury to her right knee. (R. 33, 207, 211.)   She testified that because of pain she had problems sitting, and could sit and stand for only about ten to fifteen minutes at a time. (R. 215-16.)   She stated that at times she had no trouble walking, but sometimes she would stumble a lot and other times she would get cramps and have to sit down. (R. 214.)   She further stated that she could lift no more than one to two pounds. (R. 218.)   Her injuries were partially treated with Bextra, Tramadol, and Ultracet, and she had undergone several epidural steroid injections. (R. 51, 209-10.)   She stated that either her medications or injections triggered muscle spasms that sometimes caused her to drop items she was holding. (R. 217.)   She

16

testified that her medications made her drowsy, causing her to sleep a majority of the day. (R. 211.)

Regarding her activities of daily living, Plaintiff stated that, when not sleeping, she walked around her apartment complex, watched television, and read books, magazines and newspapers. (R. 211-12.)  She did her own cooking, dishwashing, and laundering. (R. 212.)  She stated that she was also able to go shopping, mop and sweep, and make her bed, each with significant difficulty. (R. 212-13.)  When not sleeping, she attended church, watched TV, and would sometimes visit her mother and sister. (R. 213.)

The ALJ determined that Plaintiff had not been engaged in substantial gainful activity since November 23, 2001, and that Plaintiff was severely impaired by degenerative disc disease of the lumbosacral spine and the residuals of her right ankle fracture, but her condition did not meet or equal a listed impairment. (R. 16.)  The ALJ found that, in an eight-hour workday, Plaintiff could sit at least six hours, stand/walk for at least two hours, and lift/carry ten pounds occasionally, concluding that Plaintiff was capable of performing sedentary work. (Id.)  The ALJ determined that Plaintiff could perform her past relevant work as a hospital admitting clerk and hence was not "disabled" as defined in the Social Security Act. (Id.)

In reaching her decision, the ALJ rejected the opinion of Plaintiff's treating physician, Dr. Selassie, who found that Plaintiff's impairments precluded the performance of sedentary

17

work.   In discounting Dr. Selassie's findings, the ALJ relied primarily on what she found to be a series of internal inconsistencies in the doctor's responses to the November 25, 2003 disability form questionnaire. (R. 14-15.)  The ALJ further cited a lack of objective medical evidence in support of the doctor's findings, and the fact that Dr. Selassie had only been treating Plaintiff for two weeks at the time of her assessment. (Id.)  The ALJ concluded that "Dr. Selassie['s] . . . opinion is not based on the facts and is not persuasive," and hence "is entitled to very little weight." (R. 15.)

Having rejected Dr. Selassie's opinion, the ALJ looked to Plaintiff's own testimony, concluding based on Plaintiff's "description of her symptomatology, treatment, functional limitations and daily activities . . . that while the claimant may experience some subjective degree of pain, her symptoms are not of such severity, frequency, or duration as to preclude the performance of sedentary work." (Id.)  Referring mostly to excerpts from the examination by Dr. Patel, the SSA consultative examiner, the ALJ found Plaintiff's testimony "was not supported by clinical findings or objective diagnostic studies." (Id.)  She reasoned, for example, that while Plaintiff "stated that she needed a cane to walk, . . . Dr. Patel reported that she was able to walk on her heels and toes, and had no difficulty rising from a chair or the examination table." (Id.)  Regarding the drowsiness Plaintiff identified as a side effect of her medications, the ALJ held that

18

"if the medications caused such tiredness, they could be adjusted or changed.  I find no medical need to sleep all day." (Id.)

Having previously asserted that Plaintiff's work as a hospital admitting clerk was "semi-skilled and sedentary exertionally," the ALJ summed up by reiterating that Plaintiff could perform sedentary work, a conclusion consistent in her view with the medical findings and Plaintiff's own activities of daily living. (R. 16).  Thus, according to the ALJ, Plaintiff could perform her past relevant work as a hospital admitting clerk and was not disabled within the meaning of the Social Security Act. (Id.)

## DISCUSSION

## I.   Standard of Review and Governing Law

A person is disabled, for purposes of eligibility for Social Security disability benefits, when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The applicable regulations promulgated by the SSA set forth a five-step sequence to evaluate disability claims. See 20 C.F.R. § 404.1520.   The Second Circuit has explained the sequential evaluation process as follows:

> First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities."  20 C.F.R. § 404.1520.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)(citing Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); 20 C.F.R. §§ 404.1520, 416.920))(footnote omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); DeChirico v. Callahan, 134 F.3d 1177, 1179 (2d Cir. 1998). The claimant has the burden of proof with respect to the first four steps. See Perez, 77 F.3d at 46; Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983).  The Commissioner has the burden of proving, at the fifth step, that there exists substantial gainful employment in the national economy that the claimant can perform. See Perez, 77 F.3d at 46 ("If the claimant satisfies her burden of proving the

requirements in the first four steps, the burden shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working."); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004)(same); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980)(same).

In assessing a claim of disability, the Commissioner must consider objective and subjective factors, including: (1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other witnesses; and (4) the claimant's education, age, and work experience. See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Bluvband v. Heckler, 730 F.2d 886, 891 (2d Cir. 1984); Mongeur v. Heckler, 722 F.2d 1033, (2d Cir. 1983); Rosado v. Sullivan, 805 F. Supp. 147, 152 (S.D.N.Y. 1992).

A reviewing court must assess whether the Commissioner's determination was supported by substantial evidence and relied upon the correct legal standards. See 42 U.S.C. § 405(g); Pollard, 377 F.3d at 188.  "Substantial evidence . . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004)(quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)).  To determine whether substantial evidence supports a finding of the Commissioner, this Court must view the supporting evidence in light of the administrative record as a

whole, including any contradictory evidence and evidence from which conflicting inferences may be drawn. See Perez, 77 F.3d at 46; Rivera, 923 F.2d at 967; Molina v. Barnhart, No. 00 Civ. 9522 (DC), 2002 WL 377529, at *5 (S.D.N.Y. Mar. 11, 2002).  Where an ALJ's findings are based on substantial evidence, this Court must defer to them. See Barreto ex rel. Rivas v. Barnhart, No. 02 Civ. 4462 (LTS), 2004 WL 1672789, at *3 (S.D.N.Y. July 27, 2004) (citing Rosa, 168 F.3d at 77).  Moreover, the Commissioner's findings are conclusive if there is substantial evidence in the record to support them, whether or not there exists substantial evidence supporting the plaintiff's contentions. See 42 U.S.C. § 405(g); Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997).

## II.  **The Commissioner's Decision**

Here, the Commissioner concluded that Plaintiff's condition rose to the level of a severe impairment, but did not meet or equal a listing in Appendix 1, Subpart P, Regulation No. 4 of 20 C.F.R. § 404. (R. 16.)  At Step Four in the sequential analysis, the Commissioner held that Plaintiff could perform her past relevant work as an admitting clerk and hence was not disabled within the meaning of the Social Security Act.  In essence, the ALJ's opinion reasoned that 1) Plaintiff was capable of performing the full range of sedentary work,[17] and 2) Plaintiff's previous job as an admitting

---

[17] "The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers,

22

clerk fell within the category of sedentary work; thus, Plaintiff retained the residual functional capacity to perform her past relevant work. (R. 14-16.)

A.   Step Four Analysis of Plaintiff's Past Relevant Work as Admitting Clerk

The ALJ correctly performed the first three inquiries, establishing that 1) Plaintiff has not been engaged in substantial gainful employment since Nov. 23, 2001, 2) Plaintiff suffers from a "severe impairment" that significantly limited her physical ability to do basic work activities, see 20 C.F.R. § 404.1520, and 3) Plaintiff's impairments were not severe enough to meet or "medically equal" one of the impairments listed in 20 C.F.R. § 404, Appendix 1, Subpart P, Regulation No. 4.   The Court concludes, however, that the ALJ failed to apply the correct legal standard in assessing Plaintiff's past relevant work under Step Four of the sequential analysis.   Moreover, the ALJ conflated the analyses under Steps 4 and 5, and in doing so, failed to evaluate either step with the requisite level of thoroughness.

In satisfying her burden of proof at the fourth step, Plaintiff must show that she was unable to perform the functions

_____

and small tools.   Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary . . . up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday." S.S.R. 96-9p, 1996 WL 374185 (S.S.A.), at *3 (July 2, 1996).

and duties of 1) the specific job she previously held, and 2) the job as it is generally performed in the national economy. See Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003)(citing Jock v. Harris, 651 F.2d 133, 135 (2d Cir. 1981) and S.S.R. 82-62, 1982 WL 31386 (S.S.A.)(1982)).  Here, Plaintiff testified that her job as an admitting clerk required about three hours of sitting at a desk, doing computer work and answering the telephone. (R. 200.) She testified that the remaining five hours were spent walking and transporting patients. (Id.)  Plaintiff also stated in her disability application that her job as an admitting clerk required her to transport patients, move them from chairs to wheelchairs, and often lift individuals weighing as much as 150 pounds. (R. 34.) While the parties disagree as to whether Plaintiff could perform the full range of sedentary work, there is no dispute that the duties identified by Plaintiff are physically more strenuous than any doctor has suggested Plaintiff is capable of performing, and well beyond the bounds of sedentary work.

The ALJ incorrectly ignored Plaintiff's uncontradicted testimony regarding her specific duties and responsibilities while serving as a hospital admitting clerk for twenty-two years, and instead appears to have relied exclusively on the Dictionary of Occupation Titles' ("DOT") general classification of hospital

admitting clerk as sedentary work.[18]

"[F]inding that a claimant has the capacity to do past work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable." S.S.R. 82-61, 1982 WL 31387 (S.S.A.), at *1 (1982); see also Montano v. Barnhart, No. 01 Civ. 10710 (AKH), 2003 WL 749527, at *5 (S.D.N.Y. Mar. 5, 2003); Stetler v. Shalala, 883 F. Supp. 1180, 1183 (N.D. Ind. 1995). Social Security Ruling 82-61 states that the particular facts of a case should override a description provided by the DOT. See id.; see also Guadalupe v. Barnhart, 04 Civ. 7644 (HB), 2005 WL 2033380, at *5 (S.D.N.Y. Aug. 24, 2005)("Plaintiff is the primary source for vocational documentation, and statements by [Plaintiff] regarding past work are generally sufficient for determining skill level, exertional and nonexertional demands of such work, although in some cases reference to corroborative sources such as the Dictionary of Occupational Titles is necessary.")(internal quotation marks omitted). Moreover, seizing upon a subset of a claimant's full set of former job duties and finding that limited portion to describe the claimant's past relevant work, without more, is improper. See, e.g., French v. Apfel, 62 F. Supp. 2d 659, 664 (N.D.N.Y. 1999)

---

[18] The ALJ's opinion does not cite to the record or any other source in reaching the conclusion that Plaintiff's past relevant work as a hospital admitting clerk was sedentary in nature. Based on arguments made by the Commissioner's counsel, the Court presumes the ALJ relied on the DOT in reaching her conclusion. (See Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Def. Mem."), at 2, 16.)

(ALJ's determination that "office work," as generally performed, is sedentary was not based upon substantial evidence without any vocational source); Eddy v. Massanari, 180 F. Supp. 2d 1255, 1269 (D. Kan. 2002) ("while plaintiff bears the burden of showing that he cannot perform his past relevant work, he does not bear the burden of showing that he cannot perform any part of his previous job duties."); Valencia v. Heckler, 751 F.2d 1082, 1086-87 (9th Cir. 1985) (tomato sorting was one of claimant's duties as an agricultural worker, but was not her "past relevant work"); Armstrong v. Sullivan, 814 F. Supp. 1364, 1361-72 (W.D. Tex. 1993) (ALJ erred by separating "cook" and "cashier" portions of claimant's job at a barbeque restaurant when determining whether claimant could meet demands of past relevant work).

The DOT's generic description of "hospital admitting clerk" states that the job requires interviewing incoming patients or representatives and entering information required for their admission into a computer; explaining hospital regulations; entering patient admitting information into a computer and routing a printed copy to the designated department; and, obtaining signed statements from patients to protect the hospital's interests. (R. 69.)  This description captures only a subset of the duties testified to by Plaintiff.  Yet, the ALJ did not call a vocational expert to clarify the duties of a hospital admitting clerk, and the Court finds no evidence in the record contradicting Plaintiff's

26

characterization of her duties as beyond the scope of the DOT's generalized description.

Had the ALJ correctly applied the prevailing legal standard developed above, requiring that she consider the "particular facts of [the] case" in assessing whether Plaintiff could perform her past relevant work, she may well have found that Plaintiff's past job is more accurately classified as that of "patient transporter," a medium-level job exertionally that requires escorting and transporting patients. See DOT # 355.677-014.  Instead, ignoring the actual *duties* associated with a specific job by a specific employer, the ALJ seized upon the *label* attached to that set of duties, inputted it into a formula — call it the DOT — and relied entirely upon the outputted exertional classification.  In doing so, the ALJ relied on the DOT as a primary, rather than corroborative, source; and, in effect, seized upon a subset of Plaintiff's past duties in classifying her past job as sedentary in nature.  These actions constitute the application of an erroneous legal standard.  On this basis alone, the decision of the ALJ may be set aside.  However, the ALJ's assessment of Plaintiff's residual functional capacity warrants additional comment.

B.   Step Four Analysis of Plaintiff's Residual Functional
     Capacity to Perform Sedentary Work[19]

_____

     [19] The residual functional capacity assessment is the categorization of an individual's "maximum sustained work capability" as sedentary, light, medium, heavy, or very heavy. See

In finding that Plaintiff could perform the full range of sedentary work, the ALJ rejected the contrary conclusions of Plaintiff's treating physician, Dr. Selassie.  Plaintiff alleges that, in light of the record as a whole, the ALJ erroneously failed to lend controlling weight to Dr. Selassie's findings. (See Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, at 13-19.)  Defendant argues that the ALJ's conclusion that Dr. Selassie's findings were internally inconsistent and unsupported by objective evidence provided a sound basis for rejecting her opinion. (See Def. Mem., at 13-15.)  After reviewing the complete record, the Court concludes that the ALJ's assessment of Plaintiff's residual functional capacity was not supported by substantial evidence.[20]

As noted, _supra_, the Supreme Court has defined substantial evidence to require "such relevant evidence as a reasonable mind

---

S.S.R. 96-9p, 1996 WL 374185, at *2. Though the residual functional capacity assessment is traditionally conducted at the fifth step, the Court acknowledges that its use at Step Four is not necessarily improper. See id. at n.2.

[20] The Court is referring to all evidence in the administrative record, including evidence presented as new evidence before the Appeals Council.  Because the ALJ's findings become those of the Commissioner upon the Appeals Council's denial of review, it is against the complete record that the ALJ's opinion will be tested for substantial evidence.  That includes medical evidence not available to the ALJ at the time of her decision. See Perez, 77 F.3d at 45 ("Where . . . the Appeals Council denies review after considering new evidence not before the ALJ, the Court reviews the entire administrative record, including the new evidence, to determine whether the Commissioner's decision is supported by substantial evidence.").

might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401, 92 S. Ct. at 1427.  To determine whether substantial evidence supports a finding of the Commissioner, this Court must view the supporting evidence in light of the administrative record as a whole, including any contradictory evidence and evidence from which conflicting inferences may be drawn.  See Perez, 77 F.3d at 46; Rivera, 923 F.2d at 967; Molina, 2002 WL 377529, at *5.

The opinions of the claimant's treating physician are entitled to controlling weight if they are well supported by objective medical findings and not inconsistent with other substantial record evidence. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).  The ALJ must consider the following factors when the treating physician's opinion is not given controlling weight: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion — that is, the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight that opinion is given; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist — if it is, it will be accorded greater weight; and (v) other relevant but unspecified factors. See Shaw, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d 115, 118 (2d Cir. 1998); Schaal, 134 F.3d at 502-504.

29

The Court finds that in failing to give controlling weight to the opinion of Plaintiff's treating physician, the ALJ did not properly consider the factors listed above. While the ALJ recognized the need to provide a basis for refusing to grant controlling weight to the treating physician's findings, her reasons were not supported by the record. Here, the ALJ rejected Dr. Selassie's findings on the basis of several internal inconsistencies in her November 25, 2003 disability questionnaire. (R. 15.) For example, the ALJ found Dr. Selassie's note that "patient finds sitting makes pain better, walking and lying flat make pain worse," inconsistent with his later notes in the same report that *prolonged* sitting or standing precipitated pain, and that Plaintiff could sit no more than one hour total *in a day*. (R. 14-15.) In addition, the ALJ found Dr. Selassie's statement that Plaintiff had no limitations "grasping, turning, twisting objects or using her fingers and hands for fine manipulations" inconsistent with her later indication that Plaintiff had significant limitations doing *repetitive* reaching, handling, fingering or lifting. (R. 15.) In both cases, the ALJ identified inconsistencies where there were none. It is not necessarily inconsistent to find that sitting alleviates pain developed from walking or standing, while sustained sitting in itself also produces pain. Similarly, it is not necessarily inconsistent to find that an individual can perform the singular, mechanical act of grasping or twisting, but has significant limitations performing

30

such actions repeatedly.[21]

Similarly, the ALJ cited Dr. Patel's clinical and diagnostic findings that Plaintiff was "able to walk on her heels and toes," "had no difficulty rising from a chair or the examination table," and had "no trouble sitting," as contrary to Dr. Selassie's determination. (Id.) However, Dr. Patel's statements in his report appear to be referring to Plaintiff's physical ability to perform specific, one-time actions, and not general limitations in the functions of sitting, standing, and walking. It is not readily apparent that his findings are inconsistent with those of Dr. Selassie. The Court notes that Dr. Selassie never asserted that Plaintiff could not stand, walk, or sit, but merely that Plaintiff was limited in her ability to perform these actions repeatedly or for prolonged periods. Indeed, Dr. Patel, the SSA's consultative examiner on whom the ALJ so heavily relied, came to a similar conclusion as Dr. Selassie — namely, that Plaintiff suffered from

---

[21] There are further flaws in the ALJ's reasoning. On Question 13 of the prepared Disability Questionnaire, asking "does your patient have significant limitations in doing repetitive reaching, handling, fingering *or lifting*?," Doctor Selassie placed a check in the box "Yes." (R. 128.) A later question asked the doctor to assess Plaintiff's degree of limitation in several areas (by choosing one of four options), one of them being "grasping, turning, twisting objects," to which the doctor chose "No Limitation." (Id.) The simple means of squaring the apparent inconsistency is that even if Plaintiff has no limitations in reaching, handling or fingering — regardless of whether repetitive or singular, prolonged or momentary — significant limitations in lifting alone would reconcile the two statements. Indeed, Dr. Selassie's report says that Plaintiff could not lift/carry any weight at all. (Id.)

"moderate impairment in standing, walking, sitting, bending and lifting." (R. 76.)   Thus, taking Dr. Patel's report in its entirety, it appears to *support* Dr. Selassie's determination that Plaintiff could perform certain physical functions — such as sitting and standing — without much difficulty, but suffered more significant limitations in performing these same functions for prolonged periods.[22]

The ALJ failed to recognize that Plaintiff's testimony often corroborated Doctor Selassie's findings (and vice versa).  Instead, the ALJ often relied on arguments that were not supported by the facts in the record.  For example, the ALJ substantiated her argument that Plaintiff's testimony "was not supported by clinical findings or objective diagnostic studies" by noting that Dr. Lee's examination found Plaintiff had a negative straight leg raising test. (R. 15.)  However, this is only a portion of the story.  The complete record shows that the results of straight leg raising tests were sporadic, often changing from negative to positive and back over the course of a few months. (R. 101, 109, 110, 113, 169; 75, 100, 166.)  More importantly, this variability in test results

_____

[22]As such, Dr. Patel committed the same "error" as Dr. Selassie — finding first that Plaintiff was capable of sitting and standing, and then subsequently determining that Plaintiff suffered from "moderate impairment" in those same activities.  Setting aside the Court's disagreement with the ALJ's reasoning, a consistent application of her argument would require the ALJ to find Dr. Patel's report as "internally inconsistent" as Dr. Selassie's, and thus deserving of little or no weight.

was actually *consistent* with Dr. Selassie's findings in the disability questionnaires she completed. In each, she indicated that Plaintiff would often suffer from "good days" and "bad days," and that this would cause Plaintiff to miss at least three days of work per month, on average. (R. 130-31, 181-82.) The ALJ simply ignored those portions of Dr. Selassie's reports.

The ALJ further erred by substituting her own medical conclusions for those of Plaintiff's treating physician. An ALJ may not substitute his or her own evaluation for the conclusions of the treating physician without basing it on competent medical evidence." Doyle v. Apfel, 105 F. Supp. 2d 115, 121 (E.D.N.Y. 2000)(citing, inter alia, Balsamo v. Chater, 142 F.3d 75, 80-81 (2d Cir. 1998)). Here, in addressing Plaintiff's statements that her medications made her drowsy and caused her to sleep much of the day, the ALJ concluded, without substantiation of any sort, that "if the medications caused such tiredness, they could be adjusted or changed. I find no medical need to sleep all day." (R. 15). Yet, Dr. Selassie's reports from November 2003 and November 2004 indicate that Plaintiff suffered from severe fatigue, that her pain could not be completely relieved without side effects, AND that attempts to substitute medications in an attempt to reduce side effects had previously been made. (R. 179, 180). Despite the fact that Dr. Selassie's findings were consistent with Plaintiff's testimony and uncontradicted by any medical evidence in the record,

33

the ALJ nonetheless swept them to the side in favor of her own lay conclusions.

The Commissioner argues that there were additional inconsistencies in Dr. Selassie's reports.  For example, Dr. Selassie reported that Plaintiff had limitations with respect to her neck and upper extremities, despite the fact that "there was no evidence of any impairment of the upper extremities or neck." (Defendant's Memorandum of Law in Opposition to Plaintiff's Cross-Motion For Judgment on the Pleadings, at 3, n.2)  Also, the Commissioner argues, Dr. Selassie's findings that Plaintiff could sit, stand, and walk for a total of only two hours of an eight-hour workday would render Plaintiff bedridden, an assessment contradicted by Plaintiff's testimony regarding her activities of daily living. (Id.)

The Court agrees that there is no objective evidence in the record of impairment to the neck.[23]  In addition, at first glance, it is a valid observation that Dr. Selassie's assessment of Plaintiff's limitations in sitting, standing and walking seem to imply that Plaintiff would be bedridden for a significant portion of the day, contrary to her own testimony regarding her activities

---

[23] The Court notes, however, that Dr. Patel found in his examination that Plaintiff's flexion in both shoulders was limited to 110 degrees, providing some evidence of impairment to the upper extremities. (R. 75.)

of daily living.[24]  However, these arguments highlight the fact that the Commissioner improperly focused on the relationship between Plaintiff's *physical* impairments and her resulting limitations, at the expense of recognizing that Plaintiff's limitations are also a result of the *pain* that accompanies her impairments. See Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)(in reversing the Commissioner's decision not to grant controlling weight to claimaint's treating physician, the Court noted that "[claimant] was not complaining of deficits in motor functioning or arthritis, she was complaining of debilitating pain. . . .").

    "As a general matter, 'objective' findings are not required in order to find that an applicant is disabled." Id.; see also Rosato v. Barnhart, 352 F. Supp. 2d 386, 396 (E.D.N.Y. 2005).  For example, "[s]ubjective pain may serve as the basis for establishing disability, even if . . . unaccompanied by positive clinical findings or other 'objective' medical evidence." Donato v. Sec. of Dep't of Health and Human Servs., 721 F.2d 414, 418-19 (2d Cir. 1983); Law v. Barnhart, 439 F. Supp. 2d 296, 307 (S.D.N.Y. 2006)(same); cf. Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984)("[The Second] Circuit has long held that the subjective

---

    [24] Though, it should be noted, Dr. Selassie's findings regarding the amount of time Plaintiff could sit, stand, and walk are in response to a specific item in the questionnaire asking her to estimate Plaintiff's functional abilities "if your patient were placed in a normal competitive five day a week work environment *on a sustained basis.*" (R. 127, 179)(emphasis added).

35

element of pain is an important factor to be considered in determining disability."). Furthermore, the subjective experience of pain can support a finding of disability when "medical signs and laboratory findings . . . show that the claimant has a medical impairment(s) which could reasonably be expected to produce the pain." Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

Here, the medical reports of Dr. Selassie and Dr. Lee, supported by the results of two separate MRIs, clearly show that Plaintiff suffered from a number of spinal impairments that are associated with lower back pain.[25] Indeed, the MRI conducted on August 12, 2002 indicated that Plaintiff's mild to moderate spinal stenosis could result in sciatica, and that facet joint arthritis and degenerative disc disease were potential causes of Plaintiff's lower back pain. (R. 114-15). Dr. Lee subsequently performed three separate epidural injections to address Plaintiff's complaints of persistent pain, after which he still felt the need to refer Plaintiff to a pain specialist. Suffice it to say, objective evidence showed that Plaintiff had a medical condition that could reasonably be expected to produce pain. Yet, the ALJ discounted Plaintiff's subjective degree of pain because her testimony "was not supported by clinical findings or objective diagnostic

---

[25] These include degenerative disc disease – or osteoarthritis – and spinal stenosis with associated sciatica. Sciatica, for example, is *by definition* pain along the sciatic nerve. See Merck, at 294-96, 327-28.

studies." (R. 15).  In assessing Plaintiff's limitations, the ALJ
conflated the impact of Plaintiff's physical impairments and the
pain associated with those impairments, at the expense of the
latter.

The Commissioner argues that Dr. Selassie's finding that
Plaintiff's condition interfered with her ability to keep her neck
in a constant position is unsubstantiated by any objective evidence
in the record.  In correctly pointing out that there is no evidence
of *physical* impairment to Plaintiff's neck, the Commissioner
ignores the possibility that the *pain* associated with Plaintiff's
impairments might radiate up her back as well, limiting the use of
her neck.[26]  Indeed, in his clinical tests, Dr. Patel found that
Plaintiff had a limited range of motion in her shoulders. (R. 75.)
The Commissioner also argues that Dr. Selassie's assessment would
leave Plaintiff bedridden for all but two hours each day.  This
argument again fails to differentiate between the limitations
caused by Plaintiff's physical impairments and those caused by
pain.[27]  The fact that Plaintiff, on a particular occasion, may

---

[26] The Court is not able to conclude, nor does it intend to,
that Plaintiff did in fact suffer from significant limitations in
the use of her neck as a result of her lower back pain.  Rather,
the Court merely attempts to show that reliance strictly on
objective medical evidence in assessing whether Plaintiff suffers
limitations in the use of her neck, without also considering the
effect of Plaintiff's pain, is improper.

[27] Dr. Selassie, on the other hand, presumably did consider the
limitations caused by Plaintiff's pain in making his findings
since, not only is she a pain specialist, but she noted that

choose to endure the pain of sitting or standing for more than two hours in order to care for herself, is not necessarily inconsistent with the idea that to require her to do so on a regular and sustained basis would be unduly onerous.[28]   The ALJ and the Commissioner failed to recognize that Dr. Selassie's reports, quite correctly, were an assessment of the "nature and severity" of Plaintiff's limitations, in light of *both* her physical impairments and their associated pain symptoms, as well as the physical demands that could reasonably be anticipated in a work setting. See Green-Younger, 335 F.3d at 107 (emphasizing that, where medically supported, controlling weight is given to treating source opinions that go to the "nature and severity" of a claimant's impairments).

A specialist in pain management, Dr. Selassie diagnosed Plaintiff with lower back pain resulting from degenerative disc disease, lumbosacral spinal stenosis, and facet joint arthritis. Her findings that plaintiff suffered from "throbbing pain" and

---

Plaintiff's primary symptom was pain and that Plaintiff's experience of pain was "constant" and "throbbing."

[28] An ALJ retains the right to "assess[] a claimant's credibility and arrive[] at an independent judgment of the true extent of the claimant's pain . . . in light of the medical findings and other evidence." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Perez v. Barnhart, 234 F. Supp. 2d 336, 340-41 (S.D.N.Y. 2002).   However, beyond objective evidence of the underlying physical impairment itself, the ALJ cannot demand objective medical evidence of Plaintiff's subjective degree of pain.   On the other hand, while not the case here, it would be proper for an ALJ to reject a claimant's alleged limitations resulting from pain where the claimant admitted to, say, playing basketball every afternoon.

"aches" that were "constant" and often precipitated by "prolonged sitting" and "standing" are within the scope of her specialty, as is her determination, as treating physician, that only to a slight degree could Plaintiff's pain be relieved with medication without unacceptable side effects. (R. 126-131.)  She also found that Plaintiff's experience of pain and fatigue would "constantly" interfere with her attention and concentration. (R. 130.)  These findings were presumably within the scope of her expert knowledge.

The ALJ correctly pointed out in her opinion that Dr. Selassie had only recently begun seeing Plaintiff at the time she completed her first disability questionnaire. (R. 15.)  However, by November 24, 2004, the time at which Dr. Selassie completed her second disability questionnaire, she had been Plaintiff's treating physician for over one year, and her diagnosis was consistent with her assessment from a year earlier. (See R. 125-32, 177-83.)  Moreover, her second diagnosis relied in part upon the results of an MRI conducted on August 12, 2002, and was corroborated by a later MRI on February 6, 2005, each of which found significant impairment of the lumbosacral region of the spine. (R. 114-15, 187-88.)  Moreover, in conjunction with her diagnosis of facet joint arthritis with additional spinal impairments, Dr. Selassie's pain assessment was supported by the findings of Plaintiff's other examining doctors, who found physical evidence of disc thinning (R. 77), right leg muscle atrophy (R. 76), occasional positive straight

leg raising (R. 75, 100, 166), foot deformity (R. 119), and limited range of motion in the shoulders (R. 75). These results, including the two MRIs, were procured by doctors *other than* Dr. Selassie.

In fact, upon a complete review of the record, the Court is unable to find a single instance in which any one of Dr. Selassie's findings were specifically or directly challenged by another examining physician. Dr. Lee, upon reviewing Plaintiff's first MRI, diagnosed her with degenerative disc disease and spinal stenosis, and recommended that she be placed on short-term disability. On two occasions, he found positive straight leg raising. Over the course of one year, Dr. Lee performed three epidural steroid injections,[29] after which he recommended a fourth injection and then referred Plaintiff to see a doctor specializing in the treatment of pain. In none of Dr. Lee's reports did he conduct an assessment of the degree to which Plaintiff's impairments and associated pain limited her ability to perform functions such as sitting, standing or walking.

Dr. Patel conducted a single examination of Plaintiff, in which he did not have the benefit of any of the MRIs taken of Plaintiff's spine. His clinical tests showed positive straight leg raising in both legs, restricted range of motion in the shoulders and spine, an antalgic gait, and pain associated with climbing

---

[29] Epidural steroid injections "may accelerate pain," but are only recommended in cases where "pain is severe or persistent." See Merck, at 327-28.

stairs and bending down. (R. 74-76.)  He noted that Plaintiff was able to sit, stand and lift herself up into a seated position, but nevertheless concluded that Plaintiff suffered a "moderate impairment in standing, walking, sitting, bending and lifting secondary to lower back pain." (Id.)  He did not cast his findings in terms of how long Plaintiff could sit, stand or walk on a daily basis.  Dr. Selassie also found that Plaintiff could sit, stand and walk, but determined that Plaintiff's impairments and associated pain prevented her from sitting, standing and walking for more than two hours per day (and required her to take frequent breaks).  Dr. Patel's conclusion does not contradict that of Dr. Selassie, directly or indirectly.[30]

The only remaining source of medical disagreement in the record comes from Dr. Hendrick, a non-examining SSA Disability Consultant.  Dr. Hendrick reviewed the medical records and completed a residual functional capacity assessment form on August 30, 2002. (R. 81-87.)   He concluded that Plaintiff must

_____

[30] One could attempt to construe Dr. Patel's finding of "moderate" impairments in sitting, standing and walking as inconsistent with Dr. Selassie's finding of severe impairments to those functions.  Dr. Patel's report relies primarily upon the results of a series of range of motion tests he conducted on Plaintiff.  Dr. Selassie's reports, on the other hand, take into consideration both objective medical evidence and Plaintiff's associated pain symptoms.  The fact that Dr. Patel found moderate functional limitations by focusing on the impact of Plaintiff's physical impairments, while Dr. Selassie found severe functional limitations when Plaintiff's pain was additionally considered, is not only consistent, but also corroborative.

periodically alternate positions, which could be accomplished through normal breaks, and that Plaintiff had the capacity for sedentary work. (R. 82, 83, 86.)  However, Dr. Hendrick's findings were based on a paper-only review of a record that, at the time, did not include any records from Plaintiff's treating physician, Dr. Selassie. (R. 86.)  Without more, they do not constitute substantial evidence in support of the ALJ's opinion.  Even accepting Dr. Hendrick's assessment, his finding that Plaintiff needed to take normal breaks throughout the day in order to alternate between sitting and standing is inconsistent with the ability to perform sedentary work. See Cruz v. Apfel, No. 98 Civ. 8507 (BSJ), 2000 WL 1290741, at *1 (S.D.N.Y. Sept. 11, 2000)("[S]edentary work is ordinarily structured so that a person cannot ordinarily sit or stand at will." (citing Nelson v. Bowen, 882 F.2d 45, 48-49 (2d Cir. 1989))).

The Court recognizes that the ALJ did not have the benefit of the additional information that was submitted to the Commissioner on appeal.[31]  In its absence, the Court understands why the ALJ may have been reluctant to accept Dr. Selassie's findings, since she had only been Plaintiff's treating physician for a few weeks at the time she completed the first questionnaire about Plaintiff's physical limitations.  Nonetheless, the ALJ's opinion, incorporated

---

[31]These included Dr. Selassie's second report, completed a year after her initial report, and which relied explicitly upon an MRI and clinical diagnostic tests.

as the final decision of the Commissioner upon denial of review of Plaintiff's claim (and in light of the additional information submitted to the Appeals Council), cannot be squared with the majority of evidence in the *complete* record corroborating Dr. Selassie's findings.  The Court concludes that the Commissioner's decision not to grant controlling weight to the findings of Plaintiff's treating physician was not supported by substantial evidence.[32]  The remainder of Dr. Selassie's findings, given controlling weight, preclude a finding that Plaintiff could perform the full range of sedentary work.

In conjunction with the Court's previous discussion of the appropriate legal standard for evaluating Plaintiff's past relevant work, the Court further holds that the complete record in this case does not support a finding that Plaintiff could work at her past job as a hospital admitting clerk.  A Step Five analysis is

---

[32] The Court notes that this ruling does not apply to findings made by Dr. Selassie on issues reserved to the Commissioner herself.  The regulations specifically state that the Commissioner is "responsible for making the determination or decision about whether [the applicant] meet[s] the statutory definition of disability . . . . A statement by a medical source that [the applicant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the applicant is] disabled. 20 C.F.R. 404.1527(e); see Adomo v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994); Urban v. Sullivan, 799 F. Supp. 908, 919 (C.D. Ill. 1992).  Thus, Dr. Selassie's classification of Plaintiff as "totally incapacitated" on a document entitled "Disability Certificate" is not entitled to great weight. See McCalip v. Shalala, No. 93 Civ. 4758, 1994 WL 774037, at *9 (E.D.N.Y. August 29, 1994)(discounting treating physician's statement that claimant is "unable to work").

necessary to determine whether Plaintiff is capable of performing any other work available in the national economy.

C.  Step Five Analysis of "Any Other Work"

At Step Five, the burden rests with the Commissioner to "show there is other gainful work in the national economy [which] the claimant could perform." Balsamo, 142 F.3d at 80 (citations omitted).  "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." Rosa v. Callahan, 168 F.3d at 78 (internal quotation marks and citations omitted).  However, "exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." Id. In particular, sole reliance on the [g]rid[s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform.[33] Id.  Pain can qualify as both an exertional and nonexertional limitation. See 20 C.F.R. § 404.1569a(a); see also S.S.R. 96-9p, 1996 WL 374185, at *5.

_____

[33]Exertional capacity addresses limitations in an individual's physical capacity, divided into seven strength categories: sitting, standing, walking, lifting, carrying, pushing and pulling. 20 C.F.R. § 404.1569a(b).   Nonexertional capacity addresses impairment-caused, work-related limitations that are not exertional, such as deficiencies in speech, concentration, vision, stooping, kneeling, reaching, and feeling.  20 C.F.R. § 404.1569a(c).

As an initial matter, the Court's conclusion that the record precludes a finding that Plaintiff could perform the full range of sedentary work is not tantamount to a finding of disability. That is, it does not demand a Step Five finding that Plaintiff was unable to perform any other work. See S.S.R. 96-9p, 1996 WL 374185, at *4 (inability to perform full range of sedentary unskilled occupations, whether because of exertional or nonexertional impairments, does not by itself mandate finding of disability); see also Nelson, 882 F.2d at 49; McClay v. Apfel, No. 99 Civ. 3505 (KMW), 2001 WL 197879, at *3 (S.D.N.Y. Feb. 11, 2001)(remanding for further proceedings where, inter alia, ALJ did not follow treating physician rule and Commissioner did not meet burden of establishing plaintiff's ability to perform sedentary work); Cruz, 2000 WL 1290741, at *1 (remanding for further proceedings where, in light of treating physician's finding that claimant could only sit for four to six hours a day, ALJ's conclusion that claimant could perform sedentary work was improper).

The ALJ never made a finding as to the availability of other work in the national economy that Plaintiff could perform, because she concluded that Plaintiff could perform her past relevant work. There then remains the question of whether we should direct that the case be remanded for reconsideration by the Commissioner upon a record to be amplified. A court may order a remand for further development of the evidence "[w]hen there are gaps in the

45

administrative record or the ALJ has applied the improper legal standard." Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(quoting Parker, 626 F.2d at 235); accord Rosa, 168 F.3d at 82-83; see also Almonte v. Apfel, No. 96 Civ. 1119 (JGK), 1998 WL 150996, at *9 (S.D.N.Y. Mar. 31, 1998)(collecting cases).  On the other hand, a court may itself find a claimant disabled and remand solely for a calculation of benefits if the record reveals that "application of the correct legal standard could lead to only one conclusion." Schaal, 134 F.3d at 504; see also Rosa, 168 F.3d at 83 ("[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits."); Balsamo, 142 F.3d at 82 (remanding for benefits where evidence of disability was such that there was no apparent basis to conclude that a more complete record might support the Commissioner's decision); Doyle v. Apfel, 105 F. Supp. 2d 115, 120 (E.D.N.Y. 2000)(same, but noting that remand for hearing would be "appropriate if the record contained conflicting evidence").  A court's choice between these two alternatives "hinges on whether 'a more complete record might support the Commissioner's decision.'" Luna de Medina v. Apfel, No. 99 Civ. 4149 (SHS), 2000 WL 964937, at *3 (S.D.N.Y. July 12, 2002) (quoting Rosa, 186 F.3d at 82-83); see also Ruiz v. Barnhart, No. 01 Civ. 1120(DC), 2002 WL 826812, at *5 (S.D.N.Y. May 1, 2002); Molina, 2002 WL 377529, at *6; Medina v. Apfel, No. 00 Civ. 3940 (JGK), 2001 WL 1488284, at *4 (S.D.N.Y. Nov. 21, 2001); Doyle, 105

F. Supp. 2d at  120.

The Court's initial inclination is to remand for additional evidence since the ALJ ruled at Step Four in the sequential analysis, and resultantly did not conduct the required Step Five analysis.  The Court also acknowledges that had the ALJ proceeded to Step Five, she would have been more likely to call a vocational expert to testify regarding the availability of jobs for someone of Plaintiff's age and education, and with Plaintiff's exertional and nonexertional limitations.  However, the ALJ's analysis at Step Four relied in part on a determination that Plaintiff retained the residual functional capacity to perform the full range of sedentary work.  This same residual functional capacity assessment is conducted at Step Five in determining an individual's "maximum sustained work capability."  See S.S.R. 96-9p, 1996 WL 374185, at *2.  It is this very determination — that Plaintiff retained the ability to perform the full range of sedentary work — that the Court has found to be unsupported by substantial evidence.

Although a finding that an individual is limited to less than the full range of sedentary work does not in itself require a finding of disability, "a finding of 'disabled' usually applies when the full range of sedentary work is significantly eroded."  S.S.R. 96-9p, 1996 WL 374185, at *3.  As a starting point, the Social Security Administration's own guidelines state that a finding of disabled is required "for the majority of individuals

who are age 50 or older and who are limited to the full range of
sedentary work."[34]  Id.  Plaintiff was 56 years old at the time of
her application for benefits.  Moreover, she is limited to *less
than* the full range of sedentary work.  The severe limitations
resulting from Plaintiff's spinal impairments and associated pain
include the inability to sit for more than one hour in an 8-hour
workday; the inability to stand/walk for more than one hour in an
8-hour workday; and the need to get up and move around every ten to
fifteen minutes for a period of fifteen to thirty minutes.  Each of
these impairments individually results in a moderate to significant
erosion in the pool of available sedentary jobs.[35]  See S.S.R. 96-9p,

_____

[34] Assuming, arguendo, that Plaintiff suffered from only
exertional limitations, the grids require a finding of "disabled"
for an individual of advanced age (55 and over) who is restricted
to sedentary work, cannot perform past relevant work, and has no
transferable skills.  See Medical-Vocational Guidelines Rule
201.00(d).  In addition, for those in the advanced age category,
the grids require that there must be very little, if any,
vocational adjustment in terms of tools, work processes, work
settings, or industry in order to find a transferability of skills.
See Medical-Vocational Guidelines Rule 201.00(f).

[35] Regarding standing and walking, "if an individual can stand
and walk for a total of slightly less than 2 hours per 8-hour
workday, this, by itself, would not cause the occupational base to
be significantly eroded.  Conversely a limitation to standing and
walking for a total of only a few minutes during the workday would
erode the unskilled sedentary occupational base significantly."
S.S.R. 96-9p, 1996 WL 374185, at *6.  Regarding sitting, "If an
individual is unable to sit for a total of 6 hours in an 8-hour
workday, the unskilled sedentary occupational base will be eroded."
Id.  And in regards to alternating between sitting and standing,
"an individual may need to alternate the required sitting of
sedentary work by standing . . . periodically.  Where this need
cannot be accommodated by scheduled breaks and a lunch period, the
occupational base for a full range of sedentary work will be
eroded." Id.

1996 WL 374185, at *4.   Taken together, and combined with
Plaintiff's age and education, these limitations constitute strong
evidence that the erosion in Plaintiff's ability to perform
sedentary work warrants a finding of disabled.   Furthermore, her
condition includes periodic to constant difficulties concentrating
as a result of her symptoms, and a determination that she would
likely need to be absent from work more than three times per month.
(R. 130-31, 181-82).   These are the findings of Plaintiff's
treating physician and, as explained above, are subject to
controlling weight.   They are uncontradicted by any examining
physician or Plaintiff's own testimony.   Were the Court to remand
for further consideration, at rehearing the Commissioner would bear
the burden of establishing, over the weight of the treating
physician's findings, that there nonetheless existed gainful
employment in the national economy for someone with the limitations
catalogued above.

    In choosing the proper course, the Court finds it useful to
briefly revisit the Court's previous discussion of the ALJ's
decision not to grant controlling weight to Dr. Selassie's
findings.   First, the ALJ identified a series of internal
inconsistencies in Dr. Selassie's findings that were not in fact
inconsistent.   In her analysis, the ALJ failed to recognize the
importance of distinguishing between prolonged versus one-time
actions in analyzing Plaintiff's ability to perform sedentary work.

49

See S.S.R. 83-12, 1983 WL 31253 (S.S.A.), at *4 (1983)(sedentary work requires "that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task"); see also Nelson, 882 F. 2d at 48 ("the [Commissioner] cannot sustain [her] burden without a showing that the claimant engages in activity for sustained periods of time comparable to those required to maintain a sedentary job." (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983))).

The ALJ's use of Plaintiff's testimony regarding her activities of daily living as proof of her ability to perform sedentary work was also erroneous.  While Plaintiff indicated that she cooked for herself and performed various chores around the house, often with great difficulty, Plaintiff's testimony did not evidence an ability to sustain prolonged periods of sitting, standing, and walking; neither did her attendance once a week at church, or occasional visits to her mother or sister. (R. 211-13); See Balsamo, 142 F.3d at 81-82 (where claimant engages in a variety of activities such as driving, watching t.v., riding buses and subways, attending church and helping his wife shop, Commissioner did not sustain burden of establishing claimant's ability to perform sedentary work because there was no evidence that claimant "engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job").  It is well-established that a claimant "need not be an invalid to be

50

found disabled for the purposes of Social Security." <u>Murdaugh v.</u>
<u>Sec'y of Health & Human Servs.</u>, 837 F.2d 99, 102 (2d Cir. 1988);
<u>see also</u>, <u>e.g.</u>, <u>Balsamo</u>, 142 F.3d at 81 (driving, shopping,
carrying a gun, and periodically attending church do not
affirmatively indicate ability to perform sedentary work); <u>Carroll</u>,
705 F.2d at 643 (reading, watching television, listening to radio,
and riding the bus and the subway do not establish ability to
perform sedentary work); <u>Bridges v. Callahan</u>, 20 F. Supp. 2d 520,
529 (E.D.N.Y. 1998)(talking on telephone and driving to visit
mother do not indicate ability to perform sedentary work).
Moreover, Plaintiff is a divorcee who lives alone.  Her efforts to
maintain self-sufficiency and pursue important goals, like
attending church, unless genuinely indicative of an ability to
work, should not be held against her.  See Nelson, 882 F.2d at 49
("When a disabled person gamely chooses to endure pain in order to
pursue important goals, it would be a shame to hold this endurance
against him . . . unless his conduct truly showed that he is
capable of working.").

Also, in part by focusing on a single occasion when Dr. Lee
found that Plaintiff had a negative straight leg raising test, the
ALJ argued that Plaintiff's testimony was not supported by medical
evidence; but, in ignoring at least three occasions in which
straight leg raising tests were positive, the Commissioner's final
decision is an inaccurate depiction of the record.  Similarly, the

51

ALJ supported her decision by pointing out that while Plaintiff
"stated that she needed a cane to walk . . . , Dr. Patel reported
that she was able to walk on her heels and toes . . . ." (R. 15.)
However, Dr. Patel, in the two sentences *immediately prior* to the
one cited by the ALJ, writes that Plaintiff's "[gait] is antalgic,"
and that she "limps on her right side." (R. 75.)

In her testimony before the ALJ, Plaintiff stated that her
pain medications made her drowsy, causing her to sleep for
significant portions of the day.  This testimony was consistent
with Dr. Selassie's reports, which stated that Plaintiff suffered
from severe fatigue and that attempts to substitute medications in
order to relieve her side effects were unsuccessful. (R. 179-80.)
Yet, without any substantiation (and contrary to Dr. Selassie's
assessment), the ALJ simply asserted her lay conclusion that "if
[Plaintiff's] medications caused such tiredness, they could simply
be adjusted or changed.  I see no medical need to sleep all day."
(R. 15.)

One may argue that the ALJ could have further developed the
record regarding each of these issues.  That is, the ALJ could have
obtained further information from Dr. Selassie and Dr. Patel about
potential inconsistencies within their reports, sought additional
testimony and evidence regarding potential pain medications that
would not cause fatigue, and asked Plaintiff for additional details
regarding the frequency and duration of her activities of daily

52

living.  In addition, having erroneously concluded that Plaintiff could perform her past job as an admitting clerk, the ALJ could have consulted a vocational expert.  Surely, the ALJ could have better supplemented the record in this case — this is likely an attribute of every hearing.  Yet, there is a point at which the failure to develop a record in support of one conclusion may reflect the strength of another.  The complete record before the Commissioner suggests that we have reached just such a point.  In the Court's view, the Commissioner's errors (through the ALJ), outlined above, were not the failure to develop the record, but rather the nonuse, misuse, and misapplication of *existing* facts to form a conclusion contrary to the preponderance of evidence in a sufficiently complete record.

The Court finds no apparent basis to conclude that additional evidence would have altered the ultimate conclusion.  Instead, additional testimony would likely do nothing more than supplement the evidence already in the record — available at the time of the Commissioner's final decision — that Plaintiff could not perform any work available in the national economy.  As such, a remand solely for calculation of benefits is the appropriate course. <u>See</u> <u>Rosa</u>, 168 F.3d at 83 (discussing <u>Balsamo</u>, 142 F.3d at 80)(remanding solely for calculation of benefits where "the ALJ reached a mistaken conclusion on an otherwise complete record").  The Court finds little value in remanding for rehearing merely so that the

Commissioner can call a vocational expert to testify to the obvious — that a fifty-six year old individual, weighing almost 200 pounds and standing 5'3" tall, who must get up and move around several times each hour, and can sit, stand and walk for only two hours in an eight-hour workday, cannot perform any other work in the national economy. See Yoxall v. Apfel, No. 3:99-CV-656 (SRU), 2001 WL 539608, at *21 (D. Conn. Mar. 30, 2001)(remanding solely for calculation of benefits where, granting controlling weight to treating physician's findings, there was significant evidence that claimant could not "sit or stand for the requisite time to perform sedentary work," which led "inexorably to one conclusion – that [claimant] was disabled . . . ."); cf. Green-Younger, 335 F.3d at 109 (remanding solely for calculation of benefits where the vocational expert "admitted that a person who could sit for only thirty minutes at a time and sit or stand for only four hours a day could not . . . be otherwise employed in the national economy"); Gang v. Barnhart, No. 02-CV-3647 (FB), 2003 WL 22183423, at *6 (E.D.N.Y. Sept. 23, 2003)(remanding for calculation of benefits where treating physicians concluded that claimant could only sit for two hours in an eight-hour workday, and vocational expert "conceded that if the ALJ accepted the treating physicians' opinions, [claimant] would be unable to perform her past work and, for step five . . ., other sedentary jobs . . . .").[36]

---

[36] The Court is additionally reluctant to remand for reconsideration under the particular circumstances of this case.

54

In sum, the complete record, and specifically the findings of Plaintiff's treating doctor, who is an expert in pain management, plainly indicate that Plaintiff could not perform any substantial gainful employment available in the national economy. Plaintiff is therefore disabled as defined in the Social Security Act. Because the Court finds no apparent basis to conclude that a more complete record would allow the Commissioner to meet her burden at Step Five, see Balsamo, 142 F.3d at 82, the case should be remanded solely for calculation of benefits.

**CONCLUSION**

For the foregoing reasons, I respectfully recommend that Plaintiff's motion for judgment on the pleadings and reversal of the Commissioner's decision be granted, that Defendant's motion for judgment on the pleadings be denied, and that the action be remanded solely for calculation of benefits.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed

---

The Court is mindful of the "often painfully slow process by which disability determinations are made," Carroll, 705 F.2d at 644, and that "[a] remand, potentially followed by another appeal, could well delay the payment of benefits to which [the claimant] appears to be entitled for still further years." Balsamo, 142 F.3d at 82 (citing Carroll, 705 F.2d at 644). As in our case, over four years had passed between the claimant's application and the court's ruling in Balsamo.

with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Barbara S. Jones, United States District Judge, and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge Jones.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully Submitted,

Theodore H. Katz
United States Magistrate Judge

Dated: October 10, 2006
       New York, New York

Copies mailed to:

Charles E. Binder, Esq.
Binder & Binder
215 Park Avenue South, 6th Floor
New York, New York 10003

Leslie Ramirez-Fisher, Esq.
Assistant United States Attorney
86 Chambers St.
New York, New York 10007

56